Scott M. Riemer (SR 5005)
RIEMER & ASSOCIATES LLC
60 East 42nd Street, Suite 1750
New York, New York 10165
(212) 297-0700
sriemer@riemerlawfirm.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
IFTIKHAR AHMAD,                                                     10 CV 4545 (PAC)(MHD)

                                  Plaintiff,

       -against-

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

                                Defendant.
-----------------------------------------------------------------X

## PLAINTIFF'S REPLY MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF PLAINTIFF'S MOTION
## FOR SUMMARY JUDGMENT

Of Counsel:
   Scott M. Riemer

TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

ARGUMENT .............................................................................................................................1

    I.  HARTFORD'S 4/22/09  DETERMINATION OF AHMAD'S BENEFITS WAS
        ARBITRARY AND CAPRICIOUS .................................................................................1

        A.  Hartford's Termination Was Not Supported By
            Substantial Evidence.............................................................................................1

            1.  Hartford's Surveillance Videos of Ahmad Are Not Substantial Evidence..........1

            2.  Dr. Eaton's Peer Review Is Not Substantial Evidence .......................................3

        B.  Hartford's Termination Was Based Solely on an Evaluation of Ahmad's Cardiac
            Condition, without Consideration of His Gastrointestinal Symptoms......................4

    II.  HARTFORD'S APPEAL DENIAL WAS ARBITRARY AND CAPRICIOUS .................5

        A.  Hartford  Failed to Consult with Doctors with Appropriate Expertise to Assess
            Ahmad's Gastrointestinal Symptoms ......................................................................5

        B.  Dr. Podrid's Peer Review Is Not Substantial Evidence ............................................5

        C.  Hartford Failed to Take into Account the Favorable Determination and
            Medical Evidence of the Social Security Administration..........................................7

    III. HARTFORD'S CONFLICT OF INTEREST WAS OF GREAT IMPORTANCE...............8

CONCLUSION...........................................................................................................................11

## TABLE OF AUTHORITIES

*Chronister v. Unum Life Ins. Co. of Am.*, 563 F.3d 773, 776 (8th Cir. 2009) .....................................3

*Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 382-83 (7th Cir. 1994) ......................................4

*Hobson* v. *Metropolitan Life Ins. Co.*, 574 F.3d 75 (2d. Cir. 2009) ....................................................7

*Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406 (7th Cir. 2004) ................................................................4

## FEDERAL STATUTES

29 C.F.R.§ 2560.503-1(h)(2)(iv) ...........................................................................................................4

29 C.F.R. §2560.503-1(h)(3)(iii) ..........................................................................................................4

ARGUMENT

I. HARTFORD'S 4/22/09 DETERMINATION TO TERMINATE AHMAD'S BENEFITS WAS ARBITRARY AND CAPRICIOUS

A. Hartford's Termination Was Not Supported By Substantial Evidence

1. Hartford's Surveillance Videos of Ahmad Are Not Substantial Evidence

Hartford asserts that the surveillance tapes are just another piece of evidence. (Hartford Opp., p. 12). But, this belies the importance that the videos played in the termination of Ahmad's benefits. Every individual who was involved in the termination of Ahmad's benefits relied on the videos, including IA Hopkins, MCM Cobb, Appeals Specialist Golych, Dr. Eaton, and Dr. Podrid. (59-60, 70-72, 127, 131, 140-41, 145-46, 154, 156-57, 285, 794).

Despite trying to minimize its reliance on the videos, Hartford asserts that the videos are substantial evidence that Ahmad retained the functional capacity to work. (Hartford Opp., p.15). But, the videos only reveal short snippets of activity and, indeed, evidence predominantly inactivity. It is unreasonable to project the ability to perform the duties of a fulltime job forty hours per week, 50 weeks per year, from the ability to run an errand to a couple of stores for a few[1] minutes on 1 out of 6 days. (See Hartford SJ, p. 21). This is particularly the case given that Ahmad informed Hartford that the "activities" observed on August 26, 2008 were not representative of his functional capacity on a normal day and explained why he made a rare appearance outside his home on that particular day (*i.e.*, his wife was ill).[2] (1353).

Hartford also asserts that the video surveillance is contrary to the restrictions and limitations specified by Dr. Ezratty, and that therefore, Dr. Ezratty's restrictions and limitations lack credibility. (Hartford Opp., p.13). But, there is nothing inconsistent with Ahmad running a

---

[1] The total amount of footage of the surveillance videos amounted to far less than "up to one hour of activity" as represented by Hartford. (Hartford Opp., p.12). (See Ahmad Br., pp. 5-6).
[2] Rukhsana K. Ifitikar, Ahmad's wife, confirmed the same in her statement. (1363).

rare errand and Dr. Ezratty's opinion that Ahmad is totally disabled from fulltime work.[3] Indeed, Dr. Ezratty reviewed the videos but nonetheless continued to believe that Ahmad was totally disabled. (285, 297). Rather than being exaggerations, Dr. Ezratty's restrictions and limitations reflect his emphatic opinion of disability.

Hartford asserts that the 8/26/08 surveillance video was inconsistent with Dr. Ezratty's alleged representation that Ahmad was a "cardiac cripple" by categorizing Ahmad as NYHA Class IV. (309; Hartford Opp., pp.4, 13). But, Dr. Ezratty never called Ahmad a "cardiac cripple" and was not alone in his assessment of Ahmad. Ahmad's two other treating cardiologists, Drs. Martin Leon (381) and David Kandath (1002-03), who practice separately from Dr. Ezratty, also categorized Ahmad as NYHA Class IV, both prior to and after Hartford terminated Ahmad's benefits.[4] Dr. Kandath states:

> He continues to have class IV angina despite multiple percutaneous interventions on the left circumflex as well as right coronary artery. [. . .] I have told him in no uncertain terms that the reason he has his devastating coronary artery disease is the insulin dysmetabolic syndrome. Given his South Asian heritage, this needs to be addressed in the most immediate and urgent manner as possible. Therefore, I have spent a lot of time discussing the low-glycemic index diet approach…I have been quite blunt with him and I have told him that his life expectancy is limited if this issue is not addressed in the most immediate and aggressive manner possible…He probably is facing repeat coronary artery bypass graft surgery. He does not want to think about this at this point, but I have told him that this is probably unavoidable. This gentleman has seen multiple cardiologists (indeed, it is fairly incredible to me the number of procedures that he has undergone).

(1003-04).

---

[3] Hartford objects to Dr. Ezratty opining on Hartford's forms that he could only sit for: [blank](455,459,662); 2 hours per day (640); and "n/a" (433). (Hartford SJ, pp.19-20). But, Hartford ignores the fact that the forms completed by Dr. Ezratty (*e.g.* PCE, APS, etc.) specifically instructed him to assess Ahmad's functional capacity in a "general workplace environment" (459), "on a sustained basis mean[ing] 40 hours per week less a reasonable time for lunch and breaks, taking into account the effects, if any, of pain and/or prescribed medication" (307), or "in a competitive work situation" (993). (Hartford 56.1 Response, ¶¶19, 74). Dr. Ezratty clearly believed that Ahmad was completely restricted from a work environment. His answers do not address an environment outside of work.

[4] Furthermore, the opinions of Drs. Leon and Kandath demonstrate that between June 2005 and October 2010, Ahmad's cardiac condition worsened from NYHA Class III-IV to Class IV. (381, 1002-03).

### 2. Dr. Eaton's Peer Review Is Not Substantial Evidence

Dr. Eaton's peer review was rendered incomplete when Nurse Cobb failed to provide him with critical medical records received from Ahmad's attorney.[5] (Ahmad Br., p.10, 21-22; Hartford Opp., pp.17-18). Hartford asserts that this was excusable because the additional medical evidence was received on April 6, 2009, after Dr. Eaton completed his peer review. (*Id.* at. pp.16-17). But, Hartford did not issue its termination letter until April 22, 2009. Though Hartford had ample time to request an addendum from Dr. Eaton or to keep the record open in light of its knowledge that Ahmad was hospitalized twice in December 2008 (151, 288), it chose not to do so. This not only deprived Ahmad of a full and fair review, but it is in contradiction to Section 2.5.2.1 of Hartford's Policy & Procedure Manual (the "Manual"), which requires an MCM to reject a referral when, "[t]here was a recent change in the claimant's medical condition (surgery, complications, etc.) . . ." (Ex. 11, p. 1395; Ex. 2, 26:25-27:6).

Hartford attempts to shift the blame to Dr. Ezratty, asserting that he "could have relayed any and all relevant information" during his call with Dr. Eaton. (Hartford Opp., p. 17). But, Dr. Ezratty had no reason to believe that Dr. Eaton was missing critical medical evidence. Plus, Hartford has its own duty to gather all relevant medical documentation. Section 2.4.2 of Hartford's Manual provides, "[b]efore referring a file for MCM involvement, the IA must obtain updated medical records for the claim." (Ex. 11, p. HAR01391). An insurer's failure to follow its own procedures is evidence of arbitrary and capricious conduct. *See, e.g., Chronister v. Unum Life Ins. Co. of Am.*, 563 F.3d 773, 776 (8th Cir. 2009).

Hartford additionally admits that Nurse Cobb misidentified the 12/8/08 catheterization

---

[5] The additional medical evidence included, *inter alia*, the 12/8/08 catheterization report from Columbia (303-06), 3/30/09 PCE completed by Dr. Ezratty (307-08), and an accompanying letter informing Hartford that medical records from St. Francis would follow (288).

3

report as an "ECHO."  (Hartford Opp., p.17).  Hartford attempts to minimize this error by characterizing the error as "internal to Hartford."  (*Id*.).  But, the 4/22/09 termination letter, which referenced the non-existent ECHO, was based at least in part on the belief that Ahmad's condition had stabilized, when in fact it had worsened.  The fact that Ahmad's condition worsened would have been evident to Hartford if it had properly understood the 12/8/08 document as a catheterization, not a relatively less important ECHO.

### B. Hartford's Termination Was Based Solely on an Evaluation of Ahmad's Cardiac Condition, without Consideration of His Gastrointestinal Symptoms

Hartford asserts that administrators are not required to assess an alternative diagnosis. (Hartford Opp., pp. 11-12).  But, Hartford's reliance on *Donato v. Metropolitan Life Ins. Co*., 19 F.3d 375, 382-83 (7th Cir. 1994),[6] is misplaced because it was decided prior to the new Department of Labor claims regulations effective on January 1, 2002.  Under the new regulations, plan administrators must take into account "all comments, documents, records, and other information submitted by the claimant" and must consult with an appropriate health care professional with respect to the medical judgment involved.  *See*, 29 C.F.R. §§2560.503-1(h)(2)(iv) and (h)(3)(iii).  Subsequent to the new regulations, courts have held that insurers must consider all of the claimant's relevant diagnoses, including the combined effect of all of the problems caused by his illness. (See Ahmad Br., pp. 11-12).  In other words, even if Ahmad's GI symptoms[7] alone were not disabling, Hartford had the duty to consider his GI symptoms and the effect they had on his already disabled condition.

---

[6] Hartford also relies on *Leipzig v. AIG Life Ins. Co*., 362 F.3d 406 (7th Cir. 2004), but *Leipzig* is irrelevant to the instant case because the claimant suffered only from a cardiac condition—a second diagnosis was not involved.

[7] Hartford attempts to distinguish hemorrhoids and fissures from gastrointestinal symptoms, arguing that the two "are more properly categorized as "protological" or "colorectal." (Hartford Opp., p.10 n.5). However, protological and colorectal disorders are subcategories of gastrointestinal disorders.

## II. HARTFORD'S APPEAL DENIAL WAS ARBITRARY AND CAPRICIOUS

### A. Hartford Failed to Consult with Doctors with Appropriate Expertise to Assess Ahmad's Gastrointestinal Symptoms

On appeal, Hartford failed to rectify its failure to consider Ahmad's GI symptoms, electing not to have a doctor review the GI evidence Ahmad submitted on appeal. This was the case even though Dr. Podrid recognized that Ahmad had "an extensive cardiac history as well as gastrointestinal problems. . .that have required surgery." (787-88).

Hartford asserts that the undersigned mischaracterized Ahmad's GI symptoms as disabling in that Dr. Adsit "never stated that any of Ahmad's purported GI conditions were disabling." (Hartford Opp., p.10). But, Dr. Adsit's medical records demonstrate the severity of Ahmad's GI condition, noting a laundry list of GI diagnoses (1036) and the results of an EGD, which revealed a friable stomach due to continued use of the necessary Plavix (1037).

### B. Dr. Podrid's Peer Review Is Not Substantial Evidence

Dr. Podrid determined that Ahmad could return to full-time sedentary work as of April 22, 2009 (795). But, Ahmad underwent multiple coronary interventions in the six months following April 22, 2009, demonstrating that contrary to Dr. Podrid's opinion, Ahmad's condition did not improve or stabilize in April 2009. Indeed, it precipitously worsened.

Hartford contends that Ahmad's post-April 22, 2009 evidence is irrelevant because it comes after the fact. (Hartford Opp., pp. 6-9). But, if in fact Ahmad's condition improved to a level that he could return to work fulltime as of April 22, 2009, one would reasonably expect that he would not need life saving treatment twice in the next two months and a total of three times in the next six months. Likewise, Ahmad's condition after April 22, 2009, did not suddenly develop. The angiograms in December 2008 showed multiple blockages (303-05, 1082-83). Two of these were treated on December 8, 2008 with stents. The other non-treated blockages did

not just disappear on April 22, 2009. Moreover, even the blockages that were treated on December 8, 2008 were not resolved because they needed to be re-treated on May 29, 2009 (1019-22).

Hartford also tries to minimize the import of the temporary pacemaker inserted with the May 29, 2009 procedure, stating that such pacemakers are routinely used. (Hartford Opp., pp.8-9, 18). But, this assertion is unsupported by either Dr. Eaton or Dr. Podrid. Moreover, the articles cited by Hartford's counsel (which are outside the record) relate only to <u>carotid</u> artery procedures (and not the coronary arteries). (*Id*. at p.8 n.4). Indeed, even with respect to carotid artery procedures, none of the articles support that the insertion of a temporary pacemaker is "always utilized"—rather, it is used in situations involving "high-risk carotid stenosis" or expected complications.[8] (*Id*.). Also, by focusing only on the insertion of the temporary pacemaker from the 5/29/09 procedure, Hartford ignores the fact that Ahmad additionally required three interventions of the LCx during the same procedure (1019).

Hartford does not dispute that Dr. Podrid failed to consider Dr. Ezratty's 1/6/10 Cardiac Evaluation (993-95; Hartford Opp., pp.19-20). This oversight is critical because Dr. Ezratty continued to find Ahmad to be totally disabled even subsequent to the post-April 22, 2009 interventions, which did not materially improve his functioning. Furthermore, Dr. Ezratty detailed the information regarding how often Ahmad experienced angina complaints, which Hartford erroneously asserts was never provided. (Ahmad Br., pp.15-16).

Hartford also asserts that Dr. Ezratty's office visit notes do not support disability because

---

[8] Furthermore, articles relating to coronary artery procedures do not support Hartford's assertion. *See* Coronary Angioplasty and Stents, Mayo Clinic, http://www.mayoclinic.com/health/angioplasty/MY00352/DSECTION=risks, last visited Nov. 21, 2011; ACC/SCA&I Clinical Expert Consensus Document on Catheterization Laboratory Standards, *Journal of American College of Cardiology*, June 2001, Vol. 37(8), 2170-214, located at http://stage.acc.org/qualityandscience/clinical/consensus/angiography/angiography_V.htm, last visited Nov. 21, 2011.

he recommended that Ahmad exercise 30 minutes a day. (1000-01; Hartford Opp., p.7). Dr. Ezratty, however, saw no conflict with recommending that Ahmad exercise 30 minutes per day and his emphatic opinion that Ahmad could not work full time in any occupation. Indeed, assuming *arguendo* that Ahmad was in fact able to exercise 30 minutes per day, and there is evidence that he could not,[9] there is <u>no</u> evidence in the record (by either Dr. Eaton, Dr. Podrid or otherwise) that the ability to exercise 30 minutes per day is contrary to a claim of disability. Moreover, if Ahmad's ability to exercise were a concern of Hartford's, and there is no evidence that it was a concern by anyone other than Hartford's litigation counsel, then Hartford would have inquired into the details of the exercise recommendation. As the notes stand, there is no indication as to the type or level of exercise, or whether the 30 minute recommendation was in one sitting or cumulative throughout the day.

Lastly, Hartford implies that Ahmad's complaints are not reliable because he never went to the ER on 12/2/08, as he stated he would. (Hartford Opp., p. 24 n. 8). But, the records show Ahmad went to St. Francis Hospital for pre-cath labs on 12/2/08. (1087).

### C. Hartford Failed to Take into Account the Favorable Determination and Medical Evidence of the Social Security Administration

Hartford asserts that it "specifically discussed the SSDI award in its final determination letter, which is all that is required." (Hartford Opp., p.21). But, Hartford's reliance on *Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75 (2d. Cir. 2009) is misplaced. *Hobson* "encourage[d] plan administrators, in denying benefits claims, to explain their reasons for determining that claimants are not disabled where the SSA arrived at the opposite conclusion." 574 F.3d at 92. Here, Hartford did no such thing. Hartford merely dismissed it as irrelevant, indicating that they

---

[9] Ahmad indicated in his Statement of Continued Disability [completed on 12/2/08] that "I use[d] to walk a maximum of 15-30 min[utes] but since [the] past three weeks my conditions are worsening." (874).

7

have the right to investigate and administer benefits independent of the decisions of governmental entities. (61). Moreover, despite the fact that Ahmad furnished Hartford with his <u>complete</u> Social Security file (928) on appeal and encouraged Hartford to consider the favorable SSA determination (931), Hartford continued to ignore the SSA determination. (66-74).

III. <u>HARTFORD'S CONFLICT OF INTEREST WAS OF GREAT IMPORTANCE</u>



The facts prove otherwise. Hartford's Manual defines the term "Functionality Present" to mean what it implies, *i.e.*, that a "decision" as to the <u>level</u> of functioning was successfully made in relation to a standard of functioning, *e.g.,* the requirements of the claimant's job. Section 2.5.4.2, titled "Final Assessment HITS Decision" provides:

> After the final assessment has been documented in DCS, the MCM is required to add the Final Assessment Date and accurately document the Final Assessment Decision field in HITS. The following options can be selected from the Final Assessment Decision field in HITS:
> ➢ Functionality Present – Selected if the MCM documents a functionality level that illustrates a functional capacity that is equal to the current job requirements of the claimant's own occupation or would require an Employability Analysis Review (EAR) to determine if the claimant can return to any occupation as defined in the policy.
> ➢ Functionality Limited – Selected if the MCM documents a limited functionality level and/or the claimant's inability to sustain a meaningful functional capacity whereby meeting the policy's definition of disability.

8

> ➢ More Info – Selected if there has been a major change or there is an expected major change in the claimant's medical condition (surgery, serious exacerbation of disabling condition, serious condition not related to the disabling injury/condition, etc.) after the MCM accepted the case and this documented change prevents the MCM from continuing the review.

(Ex. 11, p. HAR01406).



Accordingly, contrary to the assertions of Hartford, when Hartford praised Cobb (providing her positive reinforcement) because she found function present at a rate significantly higher than her peers (Ex. 8, p. 1678), it was encouraging her to make decisions that directly resulted in the termination of benefits.  This is improper because MCM's should be neutral.  Neutral evaluators should not be concerned with how often they find Functionality Present.

The Manual provides:

SIU only reports an impact on a claim file when a meaningful investigation has been completed and the investigation had a direct impact on an adverse claim determination (termination, denial, adjustment, or overpayment).  If these criteria are met, the investigation should be closed with an impact, otherwise, the investigation should be closed with no impact.
**2.7.1.2 Impact Types**
There are several ways in which an investigation may impact a claim.  The impact types are:

> ➢ Termination – Information obtained during the investigation resulted in the termination or denial of benefits.
>
> . . .

(Ex. 11, p. 1407). █████████████████████████████

█████████████████████████████████████████████

████████████████████████████████

     ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Moreover, with respect to MCMs, the performance evaluations disproportionately value the "Functionality Determination" at 35% of the performance evaluation. (Ex. 8, pp. 1677, 1688, 1696). Indeed, "accuracy" and "thoroughness" are not even specific categories on Hartford's MCM performance evaluation. (Ex. 8).

## CONCLUSION

For all of the foregoing reasons, summary judgment should be granted in favor of Ahmad.

Dated: New York, New York
November 22, 2011

Respectfully submitted,

/s/ Scott M. Riemer_____
Scott M. Riemer (SR5005)
Riemer & Associates LLC
60 East 42nd Street, Suite 1750
New York, New York 10165
(212) 297-0700

CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on November 22, 2011 I served a true and complete copy of the foregoing Reply Memorandum of Law in Further Support of Summary Judgment by transmitting the same by electronic mail to the following individuals at the e-mail addresses indicated:

Michael H. Bernstein
Sedgwick LLP
125 Broad Street, 39th Floor
New York, New York 10004-2400
Tel.: (212) 422-0202
Fax: (212) 422-0925
*Attorneys for Defendant*
*Hartford Life Group Insurance Company*

I also certify that this document filed through the ECF system will be sent electronically to all registered participants on November 22, 2011.

Dated: New York, New York
      November 22, 2011

                              /s/Scott M. Riemer
                              Scott M. Riemer