UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
IFTIKHAR AHMAD,                                              Civ. Act. No.: 10 CV 4545 (PAC)(MHD)

                Plaintiff,

      -against-                                          DOCUMENT
                                                          <u>ELECTRONICALLY FILED</u>
HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

                Defendant.
-------------------------------------------------------------X


**DEFENDANT'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

                            SEDGWICK LLP
                            Attorneys for Defendant
                            Hartford Life and Accident Insurance Company
                            125 Broad Street, 39th Floor
                            New York, New York 10004-2400
                            Telephone: (212) 422-0202
                            Facsimile:  (212) 422-0925
                            [SDMA File No. 02489-000081]

*Of Counsel*
    Michael H. Bernstein
    John T. Seybert
    Daniel M. Meier

NY/755440v3

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT .................................................................................................................................. 1

    POINT I

    HARTFORD'S DENIAL OF AHMAD'S CLAIM FOR LTD BENEFITS
    WAS BASED ON SUBSTANTIAL EVIDENCE IN THE
    ADMINISTRATIVE RECORD ........................................................................................ 1

    POINT II

    HARTFORD'S DETERMINATION WAS NOT INFLUENCED
    BY CONFLICT OF INTEREST ....................................................................................... 9

CONCLUSION ............................................................................................................................. 10

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Bendik* v. *Hartford Life Ins. Co.*,
  No. 03 Civ. 8138 (LAP), 2010 WL 2730465 (S.D.N.Y. Jul. 12, 2010) ............................... 10

*Leipzig* v. *AIG Life Ins. Co.*,
  362 F.3d 406 (7th Cir. 2004) ................................................................................................ 9

*Mugan* v. *Hartford Life And Acc. Ins. Co.*,
  No. 09 CV 6711(NRB), 2011 WL 291851 (S.D.N.Y. Jan. 20, 2011) ......................... 9, 10

*Richard* v. *Fleet Financial Group Inc. LTD Employee Benefits Plan*,
  367 Fed. Appx. 230 (2d Cir. 2010) ..................................................................................... 10

**Statutes**

Employee Retirement Income Security Act of 1974 ("ERISA")
  §502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B) ............................................................................ 1

N.Y. EDUC. LAW §6503(32) ............................................................................................................ 5

**PRELIMINARY STATEMENT**

Defendant Hartford Life and Accident Insurance Company ("Hartford") submits this Memorandum of Law in reply to Plaintiff Iftikhar Ahmad's ("Ahmad") opposition and in further support of its motion for summary judgment dismissing Ahmad's Complaint (the "Complaint") for benefits under the Employee Retirement Income Security Act of 1974 ("ERISA") §502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B) on the ground that its decision to deny his claim for continuing long-term disability ("LTD") benefits under the Group Long Term Disability Insurance Plan For Employees Of American International Group, Inc. ("AIG") (the "Plan") was not arbitrary and capricious. For the reasons discussed below, Ahmad's challenges to Hartford's decision-making are all meritless.

**ARGUMENT**
**POINT I**
**HARTFORD'S DENIAL OF AHMAD'S CLAIM FOR LTD BENEFITS WAS BASED ON SUBSTANTIAL EVIDENCE IN THE ADMINISTRATIVE RECORD**

Hartford denied Ahmad's claim for continuing LTD benefits based on substantial evidence in the administrative record. (Hartford's MOL, pp. 19-21; Hartford's Opp., pp. 2-3).  Rather than respond to all of this substantial evidence, Ahmad's own motion for summary judgment and opposition to Hartford's motion, advanced several unsupported arguments identifying new grounds for his disability claim, which he then abandoned once Hartford properly challenged this argument on both the facts and law.  For example, in support of his motion, Ahmad argued that his purported gastrointestinal ("GI") conditions were exacerbating and disabling on their own.  (Ahmad's MOL, pp. 1, 11-13).  As demonstrated by Hartford, however, these arguments were shown to be meritless. (Hartford's MOL, pp. 9-12).  Indeed, while Ahmad argued in his motion that Hartford improperly failed to consider his allegedly disabling GI condition and further failed to consult with doctors with appropriate expertise to assess these allegedly disabling symptoms (Ahmad's MOL, pp. 11-13), his opposition concedes that "these symptoms alone may not be disabling."  (Ahmad's Opp., p. 7).  Notably, Ahmad has never shown how his GI condition alone, or in combination with his cardiac

1

condition, renders him disabled under the Plan.

Similarly, Ahmad originally argued that his coronary disability is evident based on the fact that a temporary pacemaker was utilized during his catheterization procedure. (Ahmad's MOL, pp. 2, 14, 15, 22). However, Hartford showed this argument was without merit because Ahmad's EKGs were all normal, he had no prior history arrhythmias and that the use of a temporary pacemaker during the catheterization procedure in June 2009 was simply part of the standard of care taken during this procedure. (Hartford's Opp., p. 9). Thus, Ahmad retreated from his original position and stated that this condition is also not disabling as he originally claimed, although it was still disabling. (Ahmad's Opp., pp. 10-11).

Given the foregoing, it is clear that Ahmad's attempts to manufacture a disability he did not actually have underscores the lack of record evidence supporting any of his arguments. Ahmad was originally found to be disabled under the Plan's "Your Regular Occupation" disability definition on the basis of coronary artery disease. Hartford determined that this basis for disability no longer existed as of April 22, 2009, when it terminated LTD benefits under the Plan's "Any Occupation" disability definition. If Ahmad's coronary artery disease was actually disabling as April 22, 2009, he would not need to assert new bases for his claim, as he has done in this motion. Thus, Ahmad's inaccurate description of his conditions and treatment undermine his veracity as a reliable historian and call into question the accuracy of his subjective complaints.

Having utterly failed to demonstrate that these other suspect bases for disability have any merit, Ahmad retreats in his opposition and instead attempts to prove he was disabled by his coronary condition by focusing on treatment he received well *after* his LTD benefits terminated (and his coverage under the Plan). Ahmad's claim for continuing benefits was terminated as of April 22, 2009. At that time, he still had evidence of coronary artery disease with complaints of exertional angina. (794). But Ahmad submitted no proof identifying the level of exertion that triggered his

2

complaints of angina, nor their frequency or intensity. (0795). In his opposition, Ahmad now asserts that objective evidence conclusively established that his condition was worsening by focusing on the occlusion of his arteries. (Ahmad's Opp., pp. 4-7). But Ahmad does not cite any objective medical evidence demonstrating that this condition prevented him from performing the essential duties of any sedentary occupation. Indeed, the only record that even documents Ahmad's complaints of exercise induced angina is the exercise stress test from June 2005 (four years before Hartford terminated benefits). Ahmad never submitted more recent evidence to support his claim that his coronary symptoms rendered him unable to perform sedentary work. (1344-45). In fact, to the extent proof of this issue was submitted at all, his treating doctor's notes are filled with repetitive recommendations that Ahmad exercise thirty minutes per day. (323). Furthermore, the procedures Ahmad underwent in response to the occlusions of his arteries are no different than the other interventions he had previously undergone at a time when he was still working. In fact, Ahmad had an angioplasty in September 1998, soon before starting to work at AIG in 1999. (319, 1355). Ahmad was also admitted to Lenox Hill Hospital in January 2002, September 2002, January 2003 and July 2003 for angioplasty and for stents to be implanted and also for radiation therapy. (319). Throughout this time, Ahmad was employed by AIG and was not receiving LTD disability benefits.

Indeed, the only evidence Ahmad identifies to support his claim that he was disabled by his coronary condition are the forms (not treatment records) prepared by his treating physician, Dr. Ezratty. These forms, however, are inconsistent with Dr. Ezratty's treatment notes and demonstrate a lack of consideration of Ahmad's actual abilities. Indeed, Dr. Ezratty's forms indicate increased restrictions on Ahmad's ability to sit without any evidence of a material change in his condition or an explanation of why such dramatic restrictions were warranted. (*Compare* 0662 *with* 0640 *with* 0433). Ahmad attempts to hide Dr. Ezratty's constantly changing assessment by arguing that his condition waxed and waned. (Ahmad's Opp., pp. 13-14). But Dr. Ezratty's inconsistency are so

3

universal that they even appear on different forms he prepared on the same date. For example, in his March 30, 2009 Physical Capacities Evaluation ("PCE"), Dr. Ezratty noted that Ahmad is able to sit for up to an hour and stand and walk on a sustained basis for up to an hour in a given work day. (307). However, that same day, Dr. Ezratty also categorized Ahmad as a cardiac cripple, "who should be at complete rest, *confined to bed or chair; any physical activity brings on discomfort and symptoms occur at rest.*"[1] (309) (emphasis supplied).

Remarkably, even Ahmad disagrees with Dr. Ezratty's categorization of him as a cardiac cripple. In his motion papers, Ahmad asserts that he never represented himself as an "invalid" but contrary to this assertion, Dr. Ezratty certainly did make that representation to Hartford. (Ahmad's MOL, p. 9; 309). Moreover, Dr. Ezratty completed a Functional Capacity Questionnaire dated January 6, 2010, and restricted Ahmad to sitting and standing *0 minutes* out of any workday. (991-95).[2] Thus, when Ahmad argues in his opposition papers that neither he nor Dr. Ezratty advocated a "complete restriction on any sitting in any given day," it is a misrepresentation of the record evidence. (Opp., pp. 13-14).

Notwithstanding the marked inconsistency of all of the foregoing, Ahmad doggedly embraces Dr. Ezratty's opinion that he was disabled under the terms of the Plan while simultaneously attempting to minimize (or just ignore) these inconsistencies, not to mention the wealth of countervailing proof in the administrative record. Ahmad even attempts to bolster Dr. Ezratty's opinion concerning his restrictions and limitations by characterizing it as consistent with the surveillance videos (which it is not). (Ahmad's Opp., p. 14). But this argument is illogical because Ahmad is seen in the video performing, without any apparent difficulty, activities of sitting,

---

[1] There is absolutely no evidence that Ahmad had ever been diagnosed with unstable angina or that he had angina at rest. All references to Ahmad's complaints universally describe stable angina, which only presented on exertion.

[2] Dr. Ezratty's acknowledgment that Ahmad could perform the job of a medical transcriptionist, which is a sedentary job, is not minimized by the fact that Dr. Ezratty did not believe he was "up to the training." (Ahmad's Opp., pp. 15-16). Moreover, Ahmad did not state that Dr. Ezratty found him unable to perform that job. (176).

universal that they even appear on different forms he prepared on the same date. For example, in his March 30, 2009 Physical Capacities Evaluation ("PCE"), Dr. Ezratty noted that Ahmad is able to sit for up to an hour and stand and walk on a sustained basis for up to an hour in a given work day. (307). However, that same day, Dr. Ezratty also categorized Ahmad as a cardiac cripple, "who should be at complete rest, *confined to bed or chair; any physical activity brings on discomfort and symptoms occur at rest.*"[1] (309) (emphasis supplied).

Remarkably, even Ahmad disagrees with Dr. Ezratty's categorization of him as a cardiac cripple. In his motion papers, Ahmad asserts that he never represented himself as an "invalid" but contrary to this assertion, Dr. Ezratty certainly did make that representation to Hartford. (Ahmad's MOL, p. 9; 309). Moreover, Dr. Ezratty completed a Functional Capacity Questionnaire dated January 6, 2010, and restricted Ahmad to sitting and standing *0 minutes* out of any workday. (991-95).[2] Thus, when Ahmad argues in his opposition papers that neither he nor Dr. Ezratty advocated a "complete restriction on any sitting in any given day," it is a misrepresentation of the record evidence. (Opp., pp. 13-14).

Notwithstanding the marked inconsistency of all of the foregoing, Ahmad doggedly embraces Dr. Ezratty's opinion that he was disabled under the terms of the Plan while simultaneously attempting to minimize (or just ignore) these inconsistencies, not to mention the wealth of countervailing proof in the administrative record. Ahmad even attempts to bolster Dr. Ezratty's opinion concerning his restrictions and limitations by characterizing it as consistent with the surveillance videos (which it is not). (Ahmad's Opp., p. 14). But this argument is illogical because Ahmad is seen in the video performing, without any apparent difficulty, activities of sitting,

---

[1] There is absolutely no evidence that Ahmad had ever been diagnosed with unstable angina or that he had angina at rest. All references to Ahmad's complaints universally describe stable angina, which only presented on exertion.

[2] Dr. Ezratty's acknowledgment that Ahmad could perform the job of a medical transcriptionist, which is a sedentary job, is not minimized by the fact that Dr. Ezratty did not believe he was "up to the training." (Ahmad's Opp., pp. 15-16). Moreover, Ahmad did not state that Dr. Ezratty found him unable to perform that job. (176).

walking, driving, lifting and standing in contradiction to all of Dr. Ezratty's recommended restrictions and limitations. (Hartford's Opp., pp. 12-16). Thus, Dr. Ezratty's willingness to continue to recommend and state in writing the same restrictions and limitations after viewing the surveillance video, without providing any explanation for the apparent contradiction does not make his opinion any more compelling. To the contrary, Dr. Ezratty's opinions are further undermined by the fact that, although given the opportunity, he refused to explain the inconsistency between his recommended restrictions and limitations and Ahmad's demonstrated abilities. (285).

In response to Hartford's demonstration to the Court of the notable inconsistency between Dr. Ezratty's treatment notes, containing no restrictions, and his completed forms, stating that Ahmad was basically confined to bed (Hartford's MOL, pp. 19-20), Ahmad now argues that the forms Dr. Ezratty prepared in connection with his disability claim somehow became part of the treatment records. In fact, in an effort to make "lemonade" from these factual "lemons," Ahmad now argues, in circular fashion that Dr. Ezratty's notes are consistent because the restrictions he noted on Hartford's forms ultimately became part of Dr. Ezratty's file. (Ahmad's Opp., pp. 14-15). This argument is untenable because following Ahmad's logic would lead to the insupportable conclusion that Dr. Ezratty was not required to write notes for treatment purposes about Ahmad's physical abilities, such as standing, walking, or carrying, until Hartford asked for this information. But as previously noted, N.Y. EDUC. LAW §6503(32) carries penalties for physicians who "[fail] to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient." Dr. Ezratty's notes fail to reflect that he ever even advised Ahmad of his dramatic restrictions and limitations, and the video surveillance, along with Ahmad's statements in this litigation about his physical abilities, belie any assertion that these restrictions are appropriate.

Importantly, Dr. Ezratty's opinions concerning Ahmad's purported disability were not supported by reference to any clinical reports or objective evidence. In response, Ahmad

5

manipulates the language of several reports to argue that Dr. Ezratty's conclusory statements were supported by clinical findings. (Ahmad's Opp., pp. 8-12). However, these findings do not support restrictions and limitations on Ahmad's ability to perform the duties of any occupation. In this regard, Ahmad first argues that his June 13, 2005 stress test was improperly relied upon by the independent peer review physician and in Hartford's initial denial letter to demonstrate his good functional capacity, even though the test was outdated. (Ahmad's Opp., pp. 8-9). But Ahmad's criticism is without merit because Hartford actually noted that this test was outdated. (60, 657-658). Also, independent peer review physician Dr. Podrid's tangential reference to this test was only to note that it was the only exercise test provided by Ahmad, and that it was not probative of Ahmad's functional capacity four years later. (794-795). Second, Ahmad argues that Hartford's references to various test results were essentially irrelevant. (Ahmad Opp., pp. 9-12). This is ironic as Hartford's references to these test results were because Ahmad submitted them in support of his claims. Notably inconsistent with these arguments is Ahmad's assertion that the nuclear profusion test dated June 2005 demonstrates that he was unable to satisfy the duties of any occupation at that time. (Ahmad's Opp., pp. 9-10). Manifestly, this test result is also outdated and only demonstrated that an observed defect in the inferolateral wall was reversible. No doctor in 2005 or thereafter ever found this report or finding significant. (286, 790). Third, Ahmad's reference to the December 8, 2008 Cardiovascular Catheterization Comprehensive Report from New York Presbyterian Hospital as support for Dr. Ezratty's findings of disability is a *non-sequitor*. (Ahmad's Opp., p. 12). While the Report does include findings of stenosis of the LAD, this condition was treated during that catheterization procedure by insertion of a stent, which was noted to be open and patent as late as June 2009. (Hartford Opp., p. 7). Moreover, no cardiologist (including Dr. Ezratty) identified this condition as preventing Ahmad from performing the duties of a sedentary occupation four months after it was corrected. (0303-05). Dr. Ezratty's statements, several months later, that stents and

6

surgery were the cause for Ahmad's total disability, is a far cry from a contemporaneous report identifying these interventions (not "surgery") as a basis for his disability. Indeed, in his treatment notes dated January 12, 2009, Dr. Ezratty recorded that Ahmad had recovered from the procedure and was cleared for exercise. (323)

Ahmad also improperly argues that medical evidence supporting the SSA's favorable determination of his SSDI benefit claim on April 14, 2006 was inconsistent with the opinions of Drs. Eaton and Podrid and somehow lends support to his claim for continuing benefits three years later on April 22, 2009. (Ahmad's Opp., pp. 16-17). Ahmad's argument is incorrect for two reasons: (i) the reports were prepared at the same time Hartford had approved Ahmad's claim and was paying Plan benefits; and (ii) the reports were consistent with the findings of the independent medical peer review consultants. (Hartford's Opp., p. 21).

Ahmad again tries to sidestep the contradictions between his demonstrated functional ability and his treating physician's restrictions and makes several unpersuasive arguments trying to minimize these problems. (Ahmad's Opp., p. 19). First, Ahmad traveled to and stayed in Pakistan for over five months with no complications developing in his coronary artery condition, when upon his return, according to Dr. Ezratty purportedly restricted Ahmad from any sitting, standing or walking. (Hartford's MOL, p. 21; 433). Although Ahmad references a laboratory report from a hospital in Pakistan dated March 28, 2008 as evidence of complications in Pakistan (Ahmad's Opp., p. 19), the hospital visit had a nothing to do with his cardiac condition, and instead concerned a stool culture. (1084). Second, Ahmad's activities as captured in the surveillance videos contradict statements made by his treating physician regarding his physical functionality and provide evidence that he was not as impaired as he claimed. (Hartford's Opp., pp. 12-16). In response, Ahmad now argues that his symptoms were not observable without a physical examination, as purportedly illustrated by the inability of the Hartford investigator to observe his chest pain during his in-person interview.

7

(Ahmad's Opp., p. 19).[3]  This argument is baseless as the surveillance was not being used to demonstrate whether his symptoms were visible to the naked eye, but to observe Ahmad in a *non-test setting* to see if he exhibited restrictions and limitations on his functional ability that were consistent with his and his doctor's representations.  Manifestly, they were not.  Third, Ahmad paradoxically argues that his ability to maintain a computer consulting business was irrelevant to his disability claim because the business had closed.  (Ahmad's Opp., p. 18).  However, the business was only closed in 2007 (371), and its existence is suspicious, especially in light of Ahmad's travels to California in 2006 and 2007 for Cisco training.  (179, 233, 513).  Indeed, the existence of this business was one of the reasons for the SIU investigation.  (233).  Importantly, neither of these issues were substantively relied upon by Hartford in making its claim determination, but were certainly suspicious and considered during its investigative inquiries. (124-28).

Ahmad argues opposition that it was arbitrary and capricious for Hartford to terminate benefits because it had previously approved benefits finding that Ahmad was disabled from any occupation through November 30, 2008.  (Ahmad's Opp., pp. 3-4; 168).  This argument is nothing more than an attempt to escape from the weight of substantial evidence supporting Hartford's determination.  Furthermore, there is no legal support for Ahmad's argument that Hartford is bound to pay plan benefits in perpetuity because it previously awarded them.  This argument also ignores the explicit terms of the LTD Plan, which provide for Hartford's periodic review to determine if a participant remains disabled.  (029).  The record demonstrates that Hartford obtained additional medical records, an independent medical record peer review report, surveillance and an interview from a Special Investigations Unit investigator, all of which supported Hartford's initial

---

[3] Ahmad argues that he cut his in-person interview short because he needed to go to St. Francis Hospital on December 2, 2008. (Ahmad's Opp., p. 4).  However, medical records from St. Francis reflect an admission on December 3, 2008, the day after Ahmad claimed he was going to the hospital.  (1082-1083).  Ahmad presented no records from St. Francis and tries to contradict St. Francis's records with a single note from NY Presbyterian Hospital to a December 2, 2008 lab report.  (1087).  Notably, the lab test report referred to is not in the record.

8

determination that Ahmad was no longer disabled by a coronary condition as of April 22, 2009. Given the foregoing, there is nothing arbitrary and capricious about Hartford's determination.

Ahmad chastises Hartford for its observation that many public figures have returned to their stressful jobs despite having a diagnosis of stenosis of an artery or a heart condition. (Ahmad's Opp., p. 12). However, what Ahmad calls "unscientific in the extreme" is nothing more than an appropriate observation that it is feasible to work, despite having a heart condition. *See Leipzig* v. *AIG Life Ins. Co.*, 362 F.3d 406 (7th Cir. 2004). Moreover, it is clear that Hartford did not reach its final determination on his claim on the grounds that other people with coronary conditions are able to continue to work. To the contrary, the record demonstrates a principled and thorough review of Ahmad's submissions at both the initial and appeal review stages.

In his opposition, Ahmad also mischaracterizes a number of Hartford's arguments as *post-hoc* arguments. (Ahmad's Opp. pp., 1, 8, 10, 15-18). This is baseless as Hartford raised all of these points in its April 22, 2009 initial denial letter (245-53) and its April 21, 2010 appeal uphold letter. (56-61). Hartford's moving papers merely elaborated upon its original positions in its claim adjudication letters and also responded to points raised by Ahmad in this action. *Mugan* v. *Hartford Life And Acc. Ins. Co.*, No. 09 CV 6711(NRB), 2011 WL 291851 *9 (S.D.N.Y. Jan. 20, 2011).

**POINT II**
**HARTFORD'S DETERMINATION WAS NOT**
**INFLUENCED BY CONFLICT OF INTEREST**

Ahmad argues that the Court must weigh Hartford's conflict of interest as a significant factor because it did not take active steps to reduce bias. (Ahmad's Opp., pp. 20-25). All of Ahmad's arguments are demonstrably meritless. First, Ahmad's allegation that the claims and appeals units at Hartford are not separate because the Director of Appeals reports to the Assistant Vice-President of Risk Management, who in turn reports to the head of the claims department, is an attenuated stretch based on nothing more than wishful thinking. The administrative record amply

9

demonstrates that the Investigative Analyst, Sean J. Hopkins, had no communication with Edna Golych, the Appeal Specialist, who ultimately decided Ahmad's appeal. (Declaration of Anna K. Davis dated September 21, 2011, Doc. No. 27, ¶7). Thus, the organizational structure of senior level management is irrelevant. *See Mugan*, 765 F. Supp. 2d at 372. Ahmad's second argument, that as a result of a "dotted-line" report between Hartford's executives, there is no separation between its claims/appeals department and its financial department, is nonsensical. Ahmad's insinuations are hardly sufficient to show that Hartford's claims department is connected to its finance department. If anything, Ahmad's purported proof shows that Hartford's finance department has a minor reporting duty to the head of the claims department. This completely fails to raise any issue of fact as to the efficacy of Hartford's "walling-off" procedures that both Mr. Luddy and Ms. Davis describe in detail. Notably, this very argument was specifically rejected by Judge Buchwald in *Mugan*, 765 F. Supp. 2d at 372. *See also Bendik* v. *Hartford Life Ins. Co.*, No. 03 Civ. 8138 (LAP), 2010 WL 2730465 (S.D.N.Y. Jul. 12, 2010) (finding that "Hartford took steps to ensure accuracy in its claims assessment."), *aff'd,* 2011 WL 4091073 (2d Cir. Sept. 15, 2011). Ahmad's final argument, alleging that Hartford employees were influenced by Hartford's "corporate culture" is as scurrilous as it is baseless. (Ahmad's Opp., p. 24). The Court is referred to Point II of Hartford's Opposition, which addresses Ahmad's meritless arguments.

Finally, this Court need not even consider the conflict of interest factor if it determines that substantial evidence in the administrative record exists to support Hartford's determination. *See Richard* v. *Fleet Financial Group Inc. LTD Employee Benefits Plan*, 367 Fed. Appx. 230, 233 (2d Cir. 2010).

## **CONCLUSION**

For the foregoing reasons and those set forth in Hartford's initial Memorandum of Law in support of this motion, as well as the reasons set forth in Hartford's opposition to Ahmad's motion for summary judgment, this Court should grant Hartford's motion for summary judgment, dismissing Ahmad's Complaint.

Dated: New York, New York
November 22, 2011

Respectfully Submitted,

s/_____
Michael H. Bernstein (MB 0579)
John T. Seybert (JS 5014)
Daniel M. Meier (DM 2833)
SEDGWICK LLP
Attorneys for Defendant
*Hartford Life And Accident Insurance Company*

11

## **CERTIFICATE OF SERVICE**

I, DANIEL M. MEIER, hereby certify and affirm that a true and correct copy of the attached **DEFENDANT'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** was served via ECF and regular mail on this 22nd day of November, 2011, upon the following:

>Scott M. Riemer Esq.
>Riemer & Associates
>60 East 42nd Street, Suite 1750
>New York NY 10165
>Business E-mail:  sriemer@riemerlawfirm.com


>s/_____
>DANIEL M. MEIER (DM 2833)

Dated:    New York, New York
          November 22, 2011

NY/755440v3